## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

AURQUEST ALASKA, INC., an Alaska corporation, individually and on behalf of the
members of Arctic Gold Mining, LLC

               Plaintiff,

v.

ARCTIC GOLD MINING LLC, a Colorado limited liability company,
MICHAEL V. BARRY FAMILY, LLC, a Colorado limited liability company,
YOUNG FAMILY MINING, LLC, a Colorado limited liability company
ARCTIC SEA MINING, LLC, a Colorado limited liability company,
NOME OCEAN GOLD MINING CONSORTIUM, INC., a dissolved Alaska corporation,
DAVID YOUNG, an individual resident of Colorado, and
MICHAEL V. BARRY, an individual resident of Colorado.

               Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Aurquest Alaska, Inc. ("Aurquest"), for its Complaint and Jury Demand, states as follows.

### NATURE OF THE CASE

Aurquest seeks to recover damages caused by defendants' securities and common-law fraud and to secure declaratory and injunctive relief. Defendants established a sham company, Arctic Gold Mining, LLC ("AGM"), with the sole intent of obtaining cash, mining equipment, and mining claims from Aurquest and others, for the purpose of advancing defendants' own separate mining activities in the same area. In so doing, defendants acted with no regard to Aurquest's interests or the interests of AGM, in which Aurquest was led to believe it is a member. Aurquest seeks to recover

its own losses as well as losses of AGM that the insiders and controllers of the company have failed to pursue in breach of their fiduciary duties to the company and its members.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Aurquest is an Alaska corporation.  Robert Salna, a citizen of Canada, is the principal investor, shareholder and manager of Aurquest.

2.      Defendants David Young and Michael Barry are individual residents of Colorado.  They incorporated AGM.

3.      AGM is a Colorado limited liability company organized under the laws of the State of Colorado, authorized to do business in the State of Alaska.

4.      Defendant Arctic Sea Mining, LLC is a Colorado limited liability company in which David Young and Michael Barry are principals, and which may own a part of AGM.  Arctic Sea Mining is also managed and owned in part by Ken Kerr, another potentially involved party not yet named as a defendant herein.

5.      Young is a principal of Young Family Mining, LLC, a Colorado limited liability company ("Young").

6.      Barry is a principal of Michael V. Barry Family, LLC, a Colorado limited liability company ("Barry").

7.      Nome Ocean Gold Mining Consortium, Inc., is a corporation originally organized under the laws of Alaska and indirectly owned by Young and Barry (the "Consortium"), among others.  It was involuntarily dissolved in May 2021.

8.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because claims alleged herein relate to violations of the Securities Exchange Act of 1934, as amended.

9.     In addition, the Court has supplemental subject matter jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367 as those claims are so related to the claims arising under the Securities Exchange Act of 1934 as to form part of the same case or controversy under Article III of the U.S. Constitution.

10.    All defendants other than the Consortium are Colorado companies or are individuals residing in Colorado, thus such defendants are subject to the personal jurisdiction of this Court.  The Consortium, while it existed, was owned by Colorado residents also named as defendants herein, and thus is also subject to the personal jurisdiction of this Court.

11.    Venue is proper in this Court pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred in this district and/or any defendants reside in this district.

## GENERAL ALLEGATIONS

**A.     Defendants pitch an investment to Robert Salna.**

12.    Towards the end of 2011, Robert Salna, a principal of Aurquest, was an indirect investor and shareholder in an Alaska company known as Nome Gold Alaska Corporation ("Nome Gold Alaska").

13.    Nome Gold Alaska, by virtue of Salna's capital investments, acquired large numbers of mineral patents (comprising some 8,900 acres), mining equipment,

and support facilities that were intended to develop and exploit the gold resource of the uplands portions of the Nome Coastal Plain Placer Deposit, a demonstrated gold-bearing placer formation on the coast of Nome in Norton Sound, Alaska.

14.    Nome Gold Alaska's early activities, including extraction of 10,000 ounces of gold from the formation, suggest a significant potential for development of the resource in excess of 300,000 mineable ounces.

15.    Alleging misuse and misappropriation of his capital and contributed equipment, Salna filed suit against Nome Gold Alaska in 2016.

16.    As negotiations progressed toward settlement of that lawsuit, Michael Barry and David Young expressed interest in acquiring the assets of Nome Gold Alaska, which was being offered for sale.

17.    In July 2016, Young and Barry approached Salna and proposed that Arctic Sea Mining, a company they controlled, would acquire the assets of Nome Gold Alaska. They initially asked for Salna's help in finding an equity investor to fund the acquisition.

18.    As the transaction progressed, Young and Barry suggested to Salna that they would instead form AGM to serve as a vehicle for the acquisition, and proposed that Salna himself would invest in AGM.

19.    In a series of telephone conference calls that took place in early October 2016, Young and Barry represented that, after acquiring the assets of Nome Gold Alaska, they would use AGM to develop the acquired lands and resources to their potential and operate them profitably.

20.     They also represented that they had additional investors already interested in the project who would be able to add to the capital of AGM and who would, within 60 days after the acquisition of the Nome Gold Alaska assets, replace and cash out any investment that Salna made, if he chose to do so.

21.     Salna expressed interest in participating and began to search for the necessary capital.

22.     Young and Barry next circulated a draft LLC operating agreement for AGM on October 6, 2016, in which they represented that Salna's share in AGM would be 40%, and his capital contribution would be valued at $6 Million.  This was later reduced to a 20% share of the company that Salna would receive in exchange for an investment of $3 Million.

23.     On or around this same date, Young and Barry represented to Salna that this contribution would be treated as an equity investment to be replaced in short order by funds that AGM would raise, which would include a percentage "uplift" to provide Salna a return on investment.

24.     On October 7, 2016, Young and Barry sent Salna a revised draft operating agreement (the "Draft Operating Agreement") that replaced the initial draft and provided an option for Young, Barry, and Arctic Sea Mining to buy out half of Salna's interest by January 7, 2017 by paying $3,090,000.00.  This draft referred to Salna as the member, not Aurquest.

25.     On or around that date, Young and Barry told Salna that they desperately needed funds to close the acquisition.  They again promised his investment would be

repaid in short order after closing once AGM attracted new investors.  Young and Barry also informed Salna they were looking for a total of $15 Million to fund the acquisition, and needed $3 Million from Salna to meet that goal.

26.     Also on October 7, 2016, Nome Gold Alaska entered an amendment to the purchase agreement with Young, Barry, and Arctic Sea Mining.  In pertinent part, the amendment indicated the buyers would form a new entity to take title to the assets.

27.     On October 14 and 26, 2016, Salna wired a total of $3 Million to escrow to fund the acquisition.  He had obtained the funds in part through a family loan as well as his own funds and used Aurquest as the investment vehicle.

28.     On November 17, 2016, Nome Gold Alaska, Young, Barry, and Arctic Sea Mining amended the purchase agreement stating that the purchasers had assigned their rights to AGM.

29.     Closing of the acquisition by AGM of the assets of Nome Gold Alaska took place on November 22, 2016.  On that date, Aurquest's funds were irrevocably committed and transferred to Nome Gold Alaska, and AGM thereby acquired a substantial and valuable block of mineral rights, equipment, and support facilities.

30.     On information and belief, and as subsequent events would show, upon the closing of the Nome Gold Alaska acquisition, Young and Barry had no intention of using Aurquest's investment in any way that would benefit either AGM or Aurquest, and neither the ability nor the intention to replace Aurquest's investment with new capital as they had promised.

**B.** **AGM fails to document the parties' relationship.**

31.     Plaintiff has only seen the initial operating agreement of AGM in draft form dated on or around October 7, 2016 (the "Draft Operating Agreement") and, on information and belief, alleges that no final, executed operating agreement of AGM actually exists.

32.     Articles of organization for AGM were filed in Colorado on October 6, 2016.  Those articles provide that AGM had at least one member and was to be managed by one or more managers.  AGM is thus not a member-managed LLC.

33.     The Draft Operating Agreement identified LLCs linked to defendants Young and Barry as members, along with Arctic Sea Mining, and states that Young and Barry are managers of the LLC.

34.     The Draft Operating Agreement does not reflect the changes the parties agreed to prior to the closing of their acquisition.  It still refers to Salna as the member, identifies his capital contribution as $6 Million, and states that he owns 40% of the company.  Prior to the closing, Salna was never even tendered a draft agreement that fixed these or other issues.

35.     November 23, 2016 email traffic among the founders of AGM stated that the Nome Gold Alaska liquidation had closed and that personnel had been hired to operate AGM, however, only $200,000 remained in the company bank account and additional working capital would be required.

36.     On November 25, 2016 Barry emailed the purported members of AGM as stated in the Draft Operating Agreement, in addition to new, previously unknown parties also identified as "members," proposing a capital call for $1 Million.

37.     The new "members" receiving Barry's message, and not identified in the Draft Operating Agreement, include Polar Investments at 13.3% ownership, Polar Resources LLC at 13.3%, Nome Sand and Gravel at 6.6%, and Celtic Gold LLC at 16.7%, for a cumulative equity in the company, not previously mentioned let alone documented, of 49.9% of the LLC.

38.     On December 21, 2016 a law firm purporting to be counsel to AGM issued a memorandum opinion to the LLC members recommending an amendment to a purported "operating agreement" of the LLC relating to capital calls.  A proposed unanimous consent form was attached.  On information and belief, none of the purported members ever signed the proposed consent form, and none had ever signed the original Draft Operating Agreement.

39.     On information and belief, Aurquest alleges that the procedures of Article XII of the Draft Operating Agreement, relating to sales of membership interests and requiring any such transfers to be preceded by a right of first refusal to the benefit of the company, were never followed with respect to the membership interests purportedly acquired by the new "members" of the LLC who now purportedly owned approximately half the company.  The share owned by the new "members" greatly exceeds the "unallocated" share identified in the Draft Operating Agreement.

40.     On information and belief, there is no documentation anywhere as to the new "membership interests," how they were acquired, what consideration, if any, was given for them, or when or whether they came into existence.  Aurquest has requested these records from AGM but its request has been rebuffed.  On information and belief, the Draft Operating Agreement was never implemented or followed by any of the parties.

41.     Moreover, even though AGM indicated that it had attracted new investors before or soon after the closing of the Nome Gold Alaska acquisition, AGM made no attempt to replace Aurquest's capital investment as it had promised to do.

42.     On a date that is currently unknown (on information and belief it was in the Spring of 2017), the managers of AGM circulated a draft "Second Amended Operating Agreement."  This agreement contained a prominent disclosure on the first page advising that the membership interests in AGM could be securities subject to state and federal securities laws.  Previous drafts bore no such legend.  This draft agreement also contained a buyout procedure to retire Aurquest's interest.

43.     This draft amendment likewise identified Young and Barry as the Managers of the company, and the ownership interests assigned to the various Members under this draft amendment were such that Young, Barry, and Arctic Sea Mining could outvote any other individual member.

44.     On information and belief, this "Second Amended Operating Agreement" was likewise never signed by any of the members, and its provisions have never been implemented or followed by any party.

45.     In July 2020, certain parties purporting to be members of AGM drafted and executed a "Membership Interests Purchase and Sale Agreement" (the "MIPSA").  This agreement is a purchase and sale agreement, and not an LLC operating agreement.

46.     The MIPSA identified, with one exception, a completely different set of members of the company as compared to the Draft Operating Agreement.  The only member in common as between the two documents is Arctic Sea Mining, LLC, which did not suffer any alteration or change in its ownership percentage between the two documents.

47.     The MIPSA refers to Aurquest rather than Salna, and also includes the new "members" identified in paragraph 35 above as owning 49.9% of the company. However, no documentation has ever been provided explaining how any of these changes came about, in spite of request.

48.     Subsequently, the selling members of AGM identified in the MIPSA breached the purchase agreement, never delivered their membership interest to the purchasing members, and the transaction contemplated by the MIPSA never closed.

49.     It was in conducting due diligence relating to the MIPSA that Aurquest began to learn of the full extent of the looting and mismanagement of AGM wrought by its managers.

50.     The result of this activity may be that AGM, LLC, to the extent it exists at all, is a Colorado limited liability company governed by the provisions of C.R.S. §§ 7-80-101 et seq., existing without a written operating agreement.  However, it is unclear which parties are members, how they came to be members if they are, what their

respective ownership interests are, and whether or not they have the rights described in the various draft agreements.

51.     Further, AGM has rarely or never held an annual meeting as required in either the Draft Operating Agreement or Colorado statute.  On information and belief, it has conducted several special meetings in many cases without notice to Aurquest or Salna.  No minutes or other documentation of any such meetings has ever been provided to Aurquest.

52.     Long after closing of the acquisition of the assets of Nome Gold Alaska, and in spite of numerous demands, AGM has never replaced Aurquest's investment as its managers had promised.

53.     On February 9, 2017 the managers of AGM issued a notice addressed to "ALL INVESTORS" stating that "loans from investors for operation will be paid back to the investors at an interest rate of 18%."

54.     However, AGM has never paid a dime of either principal or interest to Aurquest, whether such payments could be characterized as a distribution, a replacement of equity, or a loan repayment.

55.     Thus, Aurquest has seen a return of zero on its investment of $3 Million.

**C.     AGM fails to operate and fails to develop its mineral assets.**

56.     AGM operated for two mining seasons in 2017 and 2018.  It extracted and processed gold-bearing material in 2017 and conducted processing and limited reclamation in 2018, due to having implemented insufficient processing capability for the operation.

57.     At the conclusion of the 2018 mining season, AGM abruptly and without explanation stopped all mining operations and has never resumed them.

58.     Also in 2018, AGM commissioned a critical scoping study regarding future operations.  This study estimated its property holdings to contain at least 300,000 ounces of potentially economically recoverable placer gold resources.  In five years, AGM has barely scratched the surface of this value.

59.     AGM leased ten of its patented mining claims for a single mining season in 2021, however the lessee was unable to operate due to the poor condition of AGM's mining equipment and substantial site contamination which precluded operations, as well as lack of a valid mining permit.

60.     Consequently, AGM has failed to develop and exploit its unmined placer gold resource with potential damage to its members of several million dollars.  Instead, AGM management has plundered the company of resources to use in the separate mining activities of the managers themselves in the same mining area of Norton Sound.

**D.     AGM Management allows the company property to be contaminated.**

61.     AGM allowed Arctic Sea Mining and the Consortium to illegally dispose of and dump petroleum product wastes and industrial solvents from their offshore dredge mining operations onto AGM's lands from operations occurring between 2017 and 2020.

62.     The activities of the Consortium and of Arctic Sea Mining in the offshore portions of the Nome Coastal Plain Placer Deposit are different from those conducted on the uplands portions targeted by AGM, and the equipment and assets of AGM have been modified accordingly to direct them to this unintended and unauthorized use.

63.     AGM did not properly maintain its own fleet of mining equipment which resulted in leaks of moving parts, rupture of hoses, spills and other events, thereby further contaminating its lands.

64.     AGM has been cognizant of the several releases of regulated contaminants on its lands and locations of its mining operations but has done nothing to correct the situation nor has AGM notified the appropriate regulatory authorities of its violations of Alaska's environmental and hazardous substances laws.

65.     AGM leased a portion of its lands to another company (in which Salna owned an interest and known as Mother Lode Mining) during the 2021 mining season. However, the site was inoperable due to contamination and lack of a permit.  Mother Lode Mining identified instances of site contamination and reported same, as it was required to do by law, to the Alaska Department of Environmental Conservation.

66.     Not only did AGM derive no benefit from the lease as a result of its own misuse of its own property, but the investigation, corrective action and remediation of AGM's site contamination is preliminarily estimated to cost in excess of several hundred thousand dollars.

**E.     AGM has compensated an executive for work unrelated to AGM, but for the benefit of separate businesses owned by AGM management.**

67.     Prior to AGM's November 2016 purchase of assets from Nome Gold Alaska, Cecil Connor worked as an officer of that business.

68.     After the asset sale, Connor assumed a managerial position with AGM and received salaried compensation from AGM.  Sometime in 2019, Connor was no

longer directly employed by AGM but instead functioned as a consultant receiving compensation in that capacity although his services were functionally the same for AGM.

69.     Following closing of the November 2016 asset sale to date, Connor is estimated to have received some $800,000 in compensation from AGM either directly as employee or indirectly as a consultant.

70.     A substantial part of Connor's actual work in the 2016-2021 time period was actually done for Arctic Sea Mining at the direction of Young and Barry, who are both AGM Managers and equitable owners of Arctic Sea Mining.

71.     AGM has admitted that Connor has been compensated by AGM for the benefit of Arctic Sea Mining rather than AGM's benefit.

72.     Connor has either permanently borrowed or misappropriated some $25,000 worth of AGM's surveying tools and equipment without any remuneration or benefit to AGM.

73.     Aurquest has recently learned that Connor is not the only example of Arctic Sea Mining benefitting from AGM employees or contractors without any benefit being returned to AGM, and has learned that this activity began almost immediately following closing of the Nome Gold Alaska acquisition.

**F.     AGM has sold off its gravel assets at below market value.**

74.     Among AGM's mineral assets are substantial gravel deposits which can be economically extracted and marketed in the Nome area.

75.     Young and Barry have authorized another party, Nikolai Ivanoff, to contract for sales of its gravel deposits to third parties.

76.     Ivanoff has knowingly engaged in below market sales of AGM's substantial gravel deposits on preferential terms with local businesses in the Nome area.

77.     AGM is estimated to have been damaged by hundreds of thousands of dollars of lost revenue in its below market sales of the gravel resource.

**G.     AGM has a poor record of regulatory compliance.**

78.     AGM, through the management of Young and Barry, has exhibited a cavalier disregard for regulatory compliance concerning its lands and mineral property assets.  This includes, but is not limited to, the following:

  a.   Illegal disposal of regulated contaminants and poor equipment maintenance resulting in several leaks and spills as alleged above;

  b.   Failure to maintain mining plans of operation in good standing with the Alaska Department of Natural Resources;

  c.   Failure to conduct and complete reclamation of previously mined lands in the 2017 and 2018 mining seasons, the last years of AGM's mining operations;

  d.   Failure to comply with regulations of the Mining Safety and Health Administration (MSHA);

  e.   Failure to properly or legally store explosives on its site;

    f.   Failure to conduct mining operations in wetlands in conformance with standards and practices of the Army Corps of Engineers pursuant to § 404 of the Clean Water Act.

79.    This mismanagement of AGM has further damaged the company.

**H.**    **AGM management misappropriates LLC equipment and assets.**

80.    Arctic Sea Mining and the Consortium are two entities controlled by Young and Barry.  Each of these companies also independently operates in the Nome area, but in the offshore portions, separately from the uplands areas intended to be operated by AGM.

81.    Arctic Sea Mining is owned and controlled by Young and Barry, who are also the managers of AGM.

82.    The Consortium was an Alaska corporation formed and primarily owned by Young and Barry, the managers of AGM.

83.    On information and belief, both Arctic Sea Mining and the Consortium have conducted offshore mining operations in the Nome Beach Placer using AGM assets, equipment, buildings and salaried personnel, with no consideration paid to AGM.

84.    This equipment includes a placer processing plant valued at over $600,000, which on information and belief is used by both companies with no compensation to AGM.

85.    Aurquest has requested records of leases, contracts, or evidence of payments made in connection with these activities but has been rebuffed.

**E.      AGM fails to protect, secure, or maintain company equipment**

86.      AGM's inventory of mining equipment is substantial with book value of approximately $2.8 Million as of the date it was acquired from Nome Gold Alaska in 2016.

87.      AGM failed to properly maintain its mining equipment during 2017-18 mining operations, with the result that most of the equipment is in poor condition and most items are inoperable.

88.      AGM's labor force assignment to equipment maintenance was incompetent and negligent.

89.      The resulting equipment repairs will take several months and cost hundreds of thousands of dollars, to the extent they are feasible.

90.      Much of the equipment owned by AGM is stored in unsecured premises, resulting in equipment theft by strangers.  It has become generally known in Nome that anyone needing spare parts can simply cannibalize them from the AGM yard.

91.      AGM has permitted its industrial site to be used by other entities and parties controlled by its managers, Young and Barry, damaging and deteriorating the site and without compensation to AGM.  Misuse of the industrial site includes unlicensed storage of explosives and hazardous materials and fuel which leaked onto the ground causing liability to AGM.

92.      AGM has never sought a rental or lease arrangement for any of the equipment it freely lends to its members, Arctic Sea Mining and the Consortium, along with AGM facilities.

93.     On information and belief, AGM has further allowed its cash and intangible assets to be disbursed to individuals and entities outside of the company, controlled by or affiliated with Young and Barry, the managers of AGM, again without reimbursement or compensation to AGM.

94.     Finally, the company's economic losses from its failure to continue mineral production and efficiently exploit its mineral resources could rise to $5 to $10 Million in lost profit annually.

**F.     The Members of AGM have tried without success to secure relief (Rule 23.1/C.R.S. § 7-80-714 allegations).**

95.     In October 2018, Salna complained to Young that the $3 Million investment had still not been replaced by new capital, and that he had not been provided a copy of the critical scoping study that AGM had commissioned.

96.     In response, Young provided a copy of the study (indirectly) but did not respond to the demand for replacement of Aurquest's investment.

97.     In June 2019, Salna complained about the sale by AGM of equipment belonging to Aurquest, which had been separately purchased from another supplier.

98.     AGM provided no information in response to this complaint, though a draft email (never sent to Salna or Aurquest) has surfaced in which AGM appears to claim it was the true owner of the equipment.  Later, AGM returned Aurquest's equipment, in a damaged and degraded state.

99.     In October 2019, Salna complained to AGM members that AGM's equipment needed to be winterized and protected against damage or loss, detailing specific actions that needed to be taken to prevent approximately $5 Million in losses.

100.    In response, AGM did little or nothing to protect the equipment, although AGM did secure a single barge that had been sinking.

101.    By the winter of 2019, it had become apparent to Salna that AGM management had not responded meaningfully to any of his requests, nor had provided any meaningful information, and probably never would.  Prior to that time, Salna believed that AGM's management would either respond appropriately to his requests for corrective action or at least provide information concerning its activities.

102.    In July 2021, Aurquest through an affiliated entity requested a report be prepared addressing several problems that AGM's lessee had encountered.  These problems have been summarily identified in the General Allegations above and include, but are not limited to, environmental contamination, derelict maintenance, inoperable mining equipment, stolen personal property, dangerous or reckless conduct, regulatory non-compliance, and exploitation of AGM's assets by businesses controlled by Young and Barry for which AGM had apparently received no compensation.  Entitled AGM Assessment, the report was authored by Douglas Baker d/b/a Aurgold LLC, who was the operator under AGM's 2021 mining lease.

103.    Aurquest through local counsel in Alaska authorized dissemination of the AGM Assessment to all the members of AGM on August 13, 2021.  The transmittal was done by email and included a cover letter explaining the purpose and need for the

report.  The cover letter concluded by saying, "Salna urgently requests that LLC members review this report and that a teleconference be arranged to discuss appropriate actions to be taken towards proper management of the LLC, protection of its assets and realization of the economic benefits of the enterprise."

104.   No such meeting ever took place.

105.   Instead, AGM management convened a special meeting to discuss a separate issue, which was whether to renew the mining lease referenced above. Aurquest was not provided a meaningful opportunity to participate in the meeting.

106.   At the close of the meeting, the lease was terminated.

107.   On October 30, 2021 Salna sent a request to AGM for records and information.  AGM responded by directing Salna to AGM counsel but did not provide a response.

108.   The members of AGM have not removed and will not remove Young and Barry as Managers of the company, nor will they challenge any of their mismanagement and looting of company assets, nor do they have any apparent means to do so.  Further attempts by Aurquest would be futile.

**G.    AGM is a sham company.**

109.   The Managers of AGM, Young and Barry, have never observed corporate formalities of AGM – for example, they have never finalized an operating agreement, have inconsistently identified the ownership interests of the members, have rarely or never held an annual meeting, have refused to make the books and records of the company available to the members (if such books and records exist), have conducted

special meetings without notice to Aurquest, without keeping minutes of the meeting, have failed to operate AGM as a separate entity, have commingled funds and other assets of AGM with those of their separate companies, have diminished company assets to the point where AGM is undercapitalized to conduct mining operations, have failed to maintain adequate company records or minutes, have used AGM as a mere shell, instrumentality or conduit of themselves and their separate companies, and have diverted company funds and assets to non-company uses.

110.    Young and Barry have used AGM as a mere vehicle to obtain assets and cash to divert to their own mining ventures, including Arctic Sea Mining, the Consortium, and, on information and belief, other companies and individuals.

111.    Thus, Young and Barry use their power as managers and members with superior voting authority to treat AGM as if it were merely their alter ego.

112.    On information and belief, the intent of Young and Barry, from the inception of AGM, was nothing more than to extract cash and other assets from Aurquest and its principal, Salna, in order to fund and support their separate mining ventures.

113.    Young and Barry's use of the limited liability company form has been used to perpetrate a wrong and disregarding the legal entity as to their individual liability would achieve an equitable result.  Use of the limited liability company form by the managers of AGM is a fraud on both Aurquest and the public.

114.    All prerequisites to the bringing of this action have been either satisfied or discharged as of the date of this filing.

## CLAIMS FOR RELIEF

First Claim for Relief:  Declaratory Judgment (C.R.S. §§ 13-51-101 et seq.)
(Against All Defendants)

115.    Aurquest incorporates its prior allegations as if set forth in full herein by this reference.

116.   Aurquest is a person interested under a deed, will, written contract, or other writing or whose rights, status, or other legal relations are affected by a statute, contract, and as such "may have determined any question of construction or validity arising under the instrument, statute, … or contract … and obtain a declaration of rights, status or other legal relations thereunder" as per C.R.S. § 13-51-106.

117.   A controversy between the parties has arisen as to whether AGM is a valid company, and if so whether it is a limited liability company governed by an operating agreement (and if so, what its terms are) or governed by the general provisions of the Colorado LLC statute pursuant to C.R.S. § 7-80-108.

118.   This is a threshold determination because the Draft Operating Agreement (which was never executed or implemented in any material respect by any of the putative parties) contains a dispute resolution clause. If the Draft Operating Agreement is existing, valid, and governs the relationship between the parties, one or more of the claims herein may be subject to arbitration; if not, they all may be litigated in this Court.

119.   The Draft Operating Agreement also provides for expulsion of members, but Colorado statute does not.  If this form of relief is available to Plaintiff, Aurquest will pursue it.

120.    There is also a dispute among the parties as to the membership of AGM, including who the members are and what their respective ownership interests are.

121.    Aurquest requests a declaration by this Court that the Draft Operating Agreement, or any similar document, is not a binding agreement; that the relationship among the parties is governed by the Colorado LLC statute, C.R.S. §§ 7-80-101 et seq.; a declaration as to the identity and ownership percentages of the Members of AGM; a declaration as to the availability of the expulsion remedy; and a declaration as to the arbitrability of the instant dispute, among other declaratory and injunctive relief.

122.    Aurquest also requests mandatory and permanent injunctive relief as to the following:  expulsion of Young and Barry; removal of them from the management of AGM; return to the company of looted assets of AGM; prohibition of the use of paid AGM executives for companies other than AGM; replacement of the management of AGM by managers to be chosen by the remaining members of the company; and other injunctive relief.

123.    The foregoing request for permanent injunctive relief is in the public interest; cannot be compensated only by money damages and is irreparable without any other plain, speedy, and adequate remedy at law; is favored by the balance of equities herein; and will preserve the status quo by returning AGM to the status of a company equipped to carry out the purposes for which it was formed.

### Second Claim for Relief: Violation of Section 10(B) of the Securities Exchange Act, 15 U.S.C. § 78j(B), and Rule 10b-5

(Against Defendants Young, Barry, and AGM)

124.    Aurquest incorporates its prior allegations as is set forth in full herein by this reference.

125.    Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful for any person "to use or employ, in connection with the purchase or sale of any security, … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."

126.    Rule 10b-5, enacted by the SEC under 15 U.S.C. § 78j(b), makes it unlawful for any person, in connection with the purchase or sale of any security, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.

127.    Aurquest's purchase of membership interests in AGM, a non-controlling membership interest without management responsibility and with expectation of profit, was a purchase of a security because, *inter alia*:

a.    Aurquest was invited to invest, and invested, cash in AGM, as well as other valuable consideration;

b.    On information and belief, the structure of the company investment was that the members of the LLC would share in the profits of the company pro rata according to their capital contributions;

c.    This profit-sharing, on information and belief, applied to Young and Barry (the promoters and managers) as well as the other members of the company;

d.      Thus, AGM was intended to be, and was structured as, a common enterprise;

e.      Aurquest's expectation was that it would share in the profits of AGM as a result of its investment;

f.      Aurquest had no expectation that it would actively manage AGM or conduct its affairs, but rather this would be done by others, in particular Barry, Young, and individuals hired by them and answerable to them;

g.      Aurquest's interest in the company, whether it was 40% or 20%, was not a controlling interest;

h.      Aurquest never had, nor was offered, any role in management;

i.      AGM was organized as a manager-managed LLC, not a member-managed LLC.

j.      Aurquest had no opportunity to negotiate protections of its investment in an LLC agreement, and in fact such an agreement was never finalized or executed;

k.      On information and belief, no member of AGM negotiated the terms of any LLC operating agreement regarding the company, and neither Aurquest nor any other member ever signed such an individualized agreement;

l.      The draft "Second Amended Operating Agreement," while only a draft, contains an express acknowledgement by AGM that the LLC membership interests at issue herein may be subject to federal and state securities laws;

m.      On information and belief, Young and Barry approached numerous parties and marketed to them the opportunity to invest in AGM;

n.      All management of the company took place, and was always intended to take place, as directed by Young and Barry, with Aurquest rarely if ever being asked or even informed as to management decisions;

o.      Such input as Aurquest would occasionally offer was always treated as advisory at best and, in general, ignored by AGM's managers;

p.      Aurquest had no opportunity or ability to secure the removal of AGM's management or replace the managers;

q.      To the extent it accurately reflects the members' respective ownership interests, the draft Second Amended Operating Agreement indicates that Young, Barry, and Arctic Sea Mining can outvote any other individual member of AGM.

r.      Officers and senior managers of the company were hired, and worked, and did such duties, as directed by Young and Barry;

s.      Annual meetings generally were not held, so Aurquest had no opportunity to vote its interest, even if it was a voting interest;

t.      Special meetings were either not held or were in some cases held without notice to Aurquest;

u.      Minutes of such meetings either do not exist or have not been provided;

v.      AGM has refused to provide information regarding the company in response to Aurquest's numerous information requests;

w.      AGM has even denied Aurquest access to the books and records of the company, and has failed to provide regular financial reports to the members;

x.      The one special meeting of the members that Aurquest learned about (from another member, not management) had nothing to do with the subjects on which Aurquest had requested a meeting; and

y.      During that meeting, Aurquest was not allowed a meaningful opportunity to speak or vote.

128.    Defendants Young and Barry, on behalf of AGM, knowingly made false representations of material facts to Aurquest and failed to disclose material facts, as set out with particularity in the foregoing paragraphs 19-20, 22-25, and 30.

129.    Young and Barry also misrepresented their intentions as to the use of Aurquest's investments, concealing their intent to loot the assets of the company and divert them to their own separate mining activities.

130.    In deciding to invest in AGM, Aurquest reasonably and justifiably relied on the statements and representations made by defendants, and on their omission of and failure to state other undisclosed facts – as defendants intended for Aurquest to do. Defendants acted with scienter.

131.    Aurquest has suffered pecuniary losses and damages as a result of these violations of Section 10(B) and Rule 10b-5 promulgated thereunder.

## Third Claim for Relief:  Violations of § 20(A) of the 1934 Act

(Against Defendants Young and Barry)

132.    Aurquest incorporates its prior allegations as if set forth in full herein by this reference.

133.    Defendants Barry and Young acted as controlling persons of AGM within the meaning of § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).

134.    As a direct and proximate result of the wrongful conduct of AGM, of which the other defendants are controlling persons, Aurquest suffered damages.  By reason of such wrongful conduct, such defendants are liable pursuant to § 20(a) of the 1934 Act.

### Fourth Claim for Relief:  Securities Fraud – Colorado and Alaska Securities Acts

(Against Defendants Young, Barry, and AGM)

135.    Aurquest incorporates its prior allegations as if set forth in full herein by this reference.

136.    Defendants are liable to Aurquest pursuant to C.R.S. § 11-51-604(3) and (4) for soliciting and selling securities to Aurquest in violation of C.R.S. §§ 11-51-501(1)(a), (b), and (c), as well as parallel provisions of the Alaska Securities Act, AS 45.56.500.

137.    In connection with the offer, sale and/or purchase of securities, defendants Young, Barry, and AGM directly or indirectly: (1) employed devices, schemes and/or artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts necessary in order to make their statements, in the light of the circumstances under which they were made, not misleading; and/or (3) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon Aurquest.

138.    In making the false and misleading statements and omissions to Aurquest, defendants Young, Barry, and AGM acted with intent to defraud or with reckless disregard for Aurquest's interests.

139.   At the time Aurquest purchased securities from AGM, it did not know, and in the exercise of reasonable care could not have known, that the representations made to Aurquest were materially false and misleading; and did not know the true facts which are alleged in this Complaint to have been omitted.

140.   Defendants are liable to Aurquest for such legal or equitable relief that the Court deems appropriate, including rescission, actual damages, interest at the statutory rate, costs, and reasonable attorneys' fees, as provided under C.R.S. § 11-51-604(3) and parallel provisions of the Alaska Securities Act.

141.   If the alternative relief of rescission is granted, Aurquest stands ready to tender its securities.  It is entitled to recover the total consideration paid for the securities (in an amount no less than $3 Million), together with interest at the statutory rate, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, as provided under C.R.S. § 11-51-604(4) and parallel provisions of the Alaska Securities Act.

## Fifth Claim for Relief: Control Person Liability – Colorado and Alaska Securities Acts

(Against Defendants Young and Barry)

142.   Aurquest incorporates its prior allegations as if set forth in full herein by this reference.

143.   AGM engaged in primary violations of the Colorado and Alaska Securities Acts.

144.   Young and Barry (the "Controlling Defendants"), by virtue of their positions, and/or specific acts described above, were, at the time of the wrongs alleged

herein, controlling persons of AGM, within the meaning of C.R.S. § 11-51-604(5) and parallel provisions of the Alaska Securities Act, AS 45.56.710.

145.   By reason of the conduct alleged herein, the Controlling Defendants are liable, jointly and severally, and to the same extent as AGM for the aforesaid wrongful conduct and are liable to Aurquest for the damages they suffered in connection with their purchase of securities.

146.   If the alternative relief of rescission is granted, Aurquest stands ready to tender its securities.  It is entitled to recover the consideration paid for the securities, together with interest at the statutory rate, costs and reasonable attorneys' fees, less the amount of income received on the security, upon the tender of the security, as provided under C.R.S. § 11-51-604(4) and parallel provisions of the Alaska Securities Act.

## Sixth Claim for Relief: Aiding and Abetting Liability – Colorado and Alaska Securities Acts

(Against Defendants Young, Barry, Arctic Sea Mining, and the Consortium)

147.   Aurquest incorporates its prior allegations as if set forth in full herein by this reference.

148.   AGM, Young, and Barry engaged in primary violations of the Colorado and Alaska Securities Acts.

149.   Defendants, at all relevant times, had knowledge of the primary violations by defendants AGM, Young, and Barry.

150.   Defendants provided substantial assistance to AGM, Young, and Barry in achieving the primary violation.

151.    By reason of the conduct alleged herein and pursuant to C.R.S. § 11-51-604(5) and parallel provisions of the Alaska Securities Act, AS 45.56.710, defendants are liable, jointly and severally, and to the same extent as AGM, for the aforesaid wrongful conduct, and are liable to Aurquest for the damages it suffered in connection with its purchase of securities.

152.    If the alternative relief of rescission is granted, Aurquest stands ready to tender its securities.  It is entitled to recover the consideration paid for the securities, together with interest at the statutory rate, costs and reasonable attorneys' fees, less the amount of income received on the security, upon the tender of the security, as provided under C.R.S. § 11-51-604(4) and parallel provisions of the Alaska Securities Act, AS 45.56.710.

### Seventh Claim for Relief: Negligent Misrepresentation

(Against Defendants AGM, Young and Barry)

153.    Aurquest incorporates its prior allegations as if set forth in full herein by this reference.

154.    Defendants AGM, Young, and Barry gave false information to Aurquest.

155.    Defendants gave such information to Aurquest in the course of a business transaction in which defendants had a financial interest.

156.    Defendants gave the information to Aurquest for its use in a business transaction.

157.    Defendants were negligent in communicating the information.

158.    Defendants gave the information with the intent that Aurquest would invest in their business transaction in reliance upon the information they had provided.

159.    Aurquest reasonably relied upon the information supplied by defendants.

160.    This reliance upon the information supplied by defendants caused damage to Aurquest in an amount to be proven at trial.

**Eighth Claim for Relief: Civil Theft pursuant to C.R.S. § 18-4-405**

(Against Defendants AGM, Young, and Barry)

161.    Aurquest incorporates its prior allegations as if set forth in full herein by this reference.

162.    Defendants AGM, Young, and Barry knowingly obtained a thing of value of another by inducing Aurquest to invest its funds and supply other valuables to them.

163.    Defendants obtained Aurquest's funds and valuables by deception.

164.    Defendants intended to permanently deprive Aurquest of its funds and valuables.

165.    Aurquest has suffered damages as a result of the defendants' conduct.

166.    Aurquest is entitled to recover three times the amount of the actual damages sustained, plus costs and reasonable attorney's fees.

**Ninth Claim for Relief: Common Law Fraud**

(Against Defendants AGM, Young and Barry)

167.    Aurquest incorporates its prior allegations as if set forth in full herein by this reference.

168.    Defendants AGM, Young and Barry made false representations of material facts to Aurquest as set out with particularity in the foregoing paragraphs, including paragraphs 19-20, 22-25, and 30 above, with regard to AGM, and omitted to disclose material facts including facts concerning their intentions at the time the omissions were made.

169.    At the time of the representations, defendants knew that the representations were false or were aware that Aurquest did not know whether the representations were true or false.

170.    Defendants made the representations non-disclosures with the intent that Aurquest would rely upon them, and in fact Aurquest did rely on defendants' representations and disclosures in investing in AGM.

171.    Aurquest's reliance was justified.

172.    Aurquest's reliance on defendants' false statements of material facts and failure to disclose other material facts caused them damages in an amount to be proven at trial.

173.    Aurquest's injuries were attended by circumstances of fraud, malice, or willful and wanton conduct, and because the defendants' conduct was malicious, oppressive, or in reckless disregard of Aurquest's rights, Aurquest is also entitled to, and claims, punitive damages.

### Tenth Claim for Relief: Violations of the Colorado LLC Statute/Breach of the Operating Agreement of AGM

(Against Defendants AGM, Young, and Barry)

174.   Aurquest incorporates its prior allegations as if set forth in full herein by this reference.

175.   Regardless of whether the parties' relationship is governed by the LLC statute or by the Draft Operating Agreement, AGM management has repeatedly and routinely violated provisions of both sets of requirements.

176.   It has never convened an annual meeting.

177.   It has conducted special meetings without notice to Aurquest, and has prevented Aurquest from participating meaningfully in the special meetings that it has convened without such notice.

178.   It has denied Aurquest access to the books and records of the company, to which Aurquest is entitled by either Colorado statute or the Draft Operating Agreement.

179.   Aurquest has been damaged by the foregoing in an amount to be determined at trial.

180.   Aurquest is also entitled to access to the books and records of AGM at any reasonable time.

181.   As a result of the foregoing misconduct, defendants Young and Barry are also liable to AGM, which has been damaged in an amount to be proven at trial.

**Eleventh Claim for Relief: Breach of Fiduciary Duty and Self-Dealing**

(Against Defendants Young, Barry, and Arctic Sea Mining)

182.   Aurquest incorporates its prior allegations as if set forth in full herein by this reference.

183.    Under either Colorado statute or the Draft Operating Agreement, the management of AGM owes the company and its members a fiduciary duty to act in the best interests of the company.

184.    Under either Colorado statute or the Draft Operating Agreement, each member of a closely-held LLC owes the other members a fiduciary duty with respect to the assets of the company and the ownership interests of the other members.

185.    In breach of these duties, defendants have appropriated and diverted capital investment, equipment, and personnel of AGM into their own ventures, Arctic Sea Mining and the Consortium, without providing for compensation to AGM.

186.    Barry and Young have advanced their own personal business interests instead of those of the company's members and the company itself.

187.    As a result, defendants are liable to both AGM and Aurquest, both of which have suffered damages in an amount to be proven at trial.

188.    AGM should prosecute claims for reimbursement against defendants for this mismanagement and misappropriation of company property and assets but has failed to do so even after exhaustion of all available corporate remedies by Aurquest.

189.    On behalf of the company and its members, Aurquest seeks a judgment from this Court requiring compensation be paid to the company for the misappropriation of its managers in an amount to be determined at trial and return of assets wrongfully diverted to other companies.

### Twelfth Claim for Relief:  Oppression of Minority Interests

(Against Defendants Young, Barry, and Arctic Sea Mining)

190.    Aurquest incorporates its prior allegations as if set forth in full herein by this reference.

191.    AGM Managers Young and Barry have used their management position to deprive Aurquest of the benefit of its investment in AGM, and have used their management position to advance their own separate business interests, to the detriment of both AGM and Aurquest.

192.    Arctic Sea Mining has been the recipient of such diversions, and has also lent its voting power to amplify the power of Young and Barry in controlling AGM at the expense of Aurquest and to the detriment of the interests of AGM.

193.    As a result of the foregoing misconduct, defendants Young, Barry, and Arctic Sea Mining are liable to AGM as well as Aurquest.

194.    Aurquest and AGM have been damaged by this conduct in an amount to be proven at trial.

## Thirteenth Claim for Relief: Equitable Accounting

(Against Defendants Young, Barry, and AGM)

195.    Aurquest incorporates its prior allegations as if set forth in full herein by this reference.

196.    Defendants Young, Barry, and AGM have misappropriated cash, equipment, personnel, and other assets of AGM for purposes other than those of the company.

197.    Defendants have refused to provide details of the transfers of cash, equipment, personnel, and other assets.

198.    Aurquest is entitled to a full accounting of such transfers and return of all assets transferred without compensation to AGM, as well as full compensation of AGM for the value of the transferred items.

### Fourteenth Claim for Relief: Unjust Enrichment

(Against Defendants Young, Barry, Arctic Sea Mining, and the Consortium)

199.    Aurquest incorporates its prior allegations as if set forth in full herein by this reference.

200.    Aurquest has conferred a benefit on Young, Barry, Arctic Sea Mining, and the Consortium, at the expense of Aurquest.

201.    The circumstances as alleged above make it unjust for defendants to retain the benefit conferred upon them by Aurquest.

202.    Aurquest is equitably entitled to return of the benefits it conferred upon defendants, in an amount to be proven at trial.

WHEREFORE, Aurquest Alaska, Inc. respectfully requests that upon trial or upon dispositive motion as to this matter, the Court enter judgment against defendants AGM, LLC, Michael V. Barry, LLC, and Young Family Mining, LLC for all damages incurred by Aurquest, including actual losses, treble damages, punitive damages, its costs, expenses, attorneys' fees, pre-judgment and post-judgment interest as provided by Colorado and/or federal law, as well as declaratory and injunctive relief as described herein, and such further relief to which they may be entitled.

### PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL ISSUES SO TRIABLE

Respectfully submitted,

CARVER SCHWARZ MCNAB KAMPER & FORBES, LLC

*/s/Christopher M. Kamper, signature on file*

By:_____

    Christopher M. Kamper, No. 24629
    Peter C. Forbes, No. 14081
    1888 Sherman Street
    Suite 400
    Denver, CO 80203
    Phone:  303-893-1815
    Email: ckamper@csmkf.com

Attorneys for Plaintiff

<u>Address of Plaintiff:</u>

2166 New Steese Hwy
Fairbanks, AK 99712